**SUPERIOR BEVERAGE COMPANY, INC., et al., Plaintiffs,**

v.

**OWENS–ILLINOIS, INC., et al., Defendants.**

No. 89 C 5251.

United States District Court, N.D. Illinois, E.D.

June 22, 1993.

**MEMORANDUM**

WILL, District Judge.

### Background

The settlement agreement in this case provides that the court, applying the cy pres

doctrine, will in its discretion distribute any amounts remaining in any of the funds established by that agreement either for distribution to class members or to cover any costs or expenses incurred in the administration of the case.

It appearing that a substantial balance would be available after all such distributions and payments had been made, the court invited applications for cy pres grants and for suggestions as to how such cy pres distributions should be made while expressly indicating that no applicants or persons making suggestions would become parties to the case by virtue of their applications or suggestions. Notice was given in various ways including published notice in the Wall Street Journal. A copy of that notice, which included the court's order, is attached hereto as Appendix A.

As a result of the foregoing, the court received fifteen (15) applications for grants and a number of letters supporting various grant applications or making suggestions as to the distribution of the funds. Thereafter, on April 14, 1993, commencing at 10:00 a.m. and continuing through the day, the court held hearings at which representatives of each of the applicants and any others who desired to do so were given an opportunity to be heard.

At those hearings, the court asked questions as to the application of cy pres principles to the various grant applications, the objectives each applicant sought to achieve with a grant, the basis for determining the amount sought, the necessity of various anticipated expenditures, and other relevant matters. Thereafter, most of the applicants filed supplemental statements and other material in support of their applications and in response to the court's questions.

■ A threshold question is necessarily the scope of and the limits imposed by the cy pres doctrine. Historically, the cy pres concept was fairly limited and restricted to the closest comparable alternative to the original purpose for which the funds in question had been designated. The trust would fail unless the dominant purpose could be carried out, but incidental requirements that became impossible or impracticable could be avoided

through the application of cy pres. See, e.g., *Noel v. Olds,* 138 F.2d 581 (D.C.Cir.1943) (allowing art gallery to be built at a different university when the named university declined the gift); *Shoemaker v. American Security & Trust,* 163 F.2d 585 (D.C.Cir.1947) (allowing home for the aged to be built on a different lot than that named in will); *Fay v. Hunster,* 181 F.2d 289 (D.C.Cir.1950) (allowing funds to be given to an existing home for the aged where the money was insufficient to build and maintain an entirely new institution). However, where the testator's dominant intent was that a separate building be built, using the funds to construct an addition to an existing building would not be allowable under cy pres, at least not where construction of a separate building was not actually impossible. *Connecticut College v. United States,* 276 F.2d 491 (D.C.Cir.1960).

In recent years, the doctrine appears to have become more flexible. Funds remaining in antitrust cases have been awarded to law schools to support programs having little or no relationship to antitrust law, competition, or the operation of our economy. In *In re Corrugated Container Antitrust Litigation, MDL # 310,* 53 Antitrust & Trade Regulation Reports 711 (S.D.Tex. Oct. 6, 1987) over $1 million was divided among six law schools, the National Association of Attorneys General and two packaging industry foundations. The Attorneys General were to use the funds for state level antitrust enforcement and education, but the law schools were not so restricted. The law schools were to use the funds to teach advocacy skills, principles, and ethics. Some law schools would use the funds to support teaching of antitrust and business law, but others were going to use the funds primarily for advocacy training. See also *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* CA No. 41774 SC (E.D.Pa. Feb. 28, 1978) (approximately $25,000 to two law schools to establish loan funds for needy students at those institutions).

In this court and circuit, distribution has been made and approved of more than 2.3 million dollars of remaining antitrust funds to the National Association for Public Interest Law (NAPIL) which has also applied for

some or all of the funds here involved. *In re Folding Carton Litigation,* 934 F.2d 323 (7th Cir.1991). NAPIL conducts an Equal Justice Fellowship program which selects fellows from recent law school graduates for assignment to public interest organizations and pays part or all of their salaries for two years plus giving loan payment assistance to fellows having student loan obligations. At least one of the grant applicants here has had a NAPIL fellow assigned to it.

The remaining funds, over $800,000, from *In re Ocean Shipping Antitrust Litigation, MDL No. 395,* (S.D.N.Y. July 29, 1991), were later added to the NAPIL fellowship program described above. Other cy pres awards include *State of Illinois v. J.W. Petersen Coal & Oil Co.,* No. 71 C 2548 (N.D.Ill. March 15, 1976) (distribution of one-half of the unclaimed residue to the Chicago Bar Foundation and one-half to the Chicago Lawyers Committee for Civil Rights). In *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2d Cir.), cert. den. 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), 66 antitrust class actions against makers of anti-biotics were settled. The portion of the settlement fund allotted to individual consumers was mostly unclaimed. The remaining funds were divided among the states to be used for public health programs that would benefit the unfound class members and the general public, although the term "cy pres" was not used. Similarly, in *United States v. Exxon Corp.,* 561 F.Supp. 816 (D.D.C.1983), aff'd 773 F.2d 1240 (Temp.Emer.Ct.App.1985), the Department of Energy sued for violation of oil price regulations. The court found that it would be impossible to trace the overcharges paid by individual consumers, although they were found to be harmed by the defendant's actions. Therefore, the court ordered that the money be given to an escrow account in the U.S. Treasury, and then divided among the states to be used in one of five federal energy conservation programs. The decision was easier in this case because Congress had passed a law setting up such an escrow account to receive funds from settlement of petroleum violation cases, but the court did state:

In formulating its order, the court in no way relies on section 155 as an express statutory grant of authority to the court, but acts instead in the exercise of its broad equitable powers to order restitution.

*Exxon,* 561 F.Supp. at 856. The court in *Pray v. Lockheed Aircraft Corp.,* 644 F.Supp. 1289, 1302 (D.D.C.1986) also held that cy pres would allow it to award to a charitable organization part of the settlement fund that it had discretion to distribute. However, due to threatened appeals that would destroy the peace the settlement sought to create, the court chose not to do so.

California state courts have been particularly supportive of cy pres distributions in cases involving consumers where some of the fund goes unclaimed by individual class members. In *State v. Levi Strauss & Co.,* 41 Cal.3d 460, 224 Cal.Rptr. 605, 611, 617, 715 P.2d 564, 570, 576 (1986) the court, in dicta, stated that a consumer trust fund would be an appropriate way to dispose of any excess funds, although the case was not at that stage yet. The *Levi* court spoke approvingly of a trust fund that had been established in *Vasquez v. Avco Financial Services,* No. NCC 11933 B (Los Angeles Super.Ct. April 24, 1984). The fund was given over to the Consumers Union to "be used in California for a purpose that is reasonably designed to benefit those persons who would otherwise have received the fund."

In the foregoing cases, the courts approved not only grants to be expended for current activities, but also grants to serve as endowments, the future income from which will be used to support ongoing, long-range projects.

We conclude from the foregoing that, while use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and courts' broad equitable powers now permit use of funds for other public interest purposes by educational, charitable, and other public service organizations, both for current programs or, where appropriate, to constitute an endowment and source of future income for long-range programs to be used in conjunction with other funds raised contemporaneously. Having served on the boards of a

number of charitable and educational organizations, the court is cognizant of the advantages of having endowment income as well as current contributions with which to finance operations.

A number of the applicants here have sought endowments in substantial amounts. Unfortunately, the available funds are insufficient to enable the court to satisfy all of them. Similarly, a number of applicants have sought amounts sufficient to fund in their entirety programs anticipated to run from one to seven years. Again, the available funds are insufficient to permit the complete funding of such programs. Specifically, the applications are for grants aggregating approximately $5,000,000 while there is only slightly more than $2,000,000 available for distribution.

■ Further, based on its experience, the court believes that the best cy pres use that can be made of the available funds is to distribute them to qualifying applicants in amounts sufficient to constitute significant "seed money" but requiring the recipients to raise the balance of the funds necessary to establish the desired endowments or to carry out the desired programs. Applying these principles, we approve the following grants.

### Grants

#### 1. *Public Interest Law Initiative (PILI)*

PILI operates a summer internship program under which law students come to Chicago to work for one of 30 public interest law agencies. The program is supported in funds or services by a large number of Chicago law firms, banks, law schools, and other community organizations. The desirability of the program and its benefits both to the interns and the organizations they serve is widely recognized. Last year PILI received 434 applications from students in 81 law schools nationwide. Thirty-eight interns from 20 law schools were selected. In 1993, PILI received a record 468 applications from 90 different law schools.

In addition to its internship program, PILI has been a leader in the efforts to induce more Chicago and Illinois law firms to perform more pro bono legal services and has developed and circulated a Model Law Firm Pro Bono Policy which has been accepted and adopted by many firms.

Each PILI intern receives $3,500 for ten weeks work. PILI has requested $14,000 which will enable it to add four more interns to next years program. Its request is approved in that amount.

#### 2. *University of Chicago Law School/Mandel Legal Aid Clinic*

The law school through its Mandel Legal Aid Clinic proposes to develop and implement a Criminal Justice Project to be headed by Randolph N. Stone, Clinical Professor of Law and Director of the Clinic, who is a former Cook County Public Defender. The Clinic will seek to participate and play a leading role in the development of a plan to improve criminal justice for juveniles, while recognizing (1) that juvenile crime is a matter of serious community concern, (2) that social, psychological, medical and educational deficits are frequently involved, and (3) that intermediate sanctions such as community corrections, mental health and drug treatment, community service, intensive probation and other sanctions may be superior to incarceration. It will seek to insure quality legal representation to juveniles as well as attending to any of the foregoing defects.

The Clinic's efforts will be coordinated with the Children and Family Justice Center of Northwestern University Law School, the Cook County Public Defender's office, the Chicago Bar Association's Justice for Youth Campaign, the Citizens Committee on the Juvenile Court, the Chicago Lawyers' Committee for Civil Rights and other agencies seeking to improve juvenile and criminal justice.

In the past, the Clinic has been almost entirely engaged in providing needy individuals with legal services in civil matters. This represents its first significant expansion into the criminal justice field.

Inasmuch as Chicago is the home of the juvenile court concept and since there is widespread recognition that the increase in juvenile crime, questions as to the operations

of the juvenile court, and the ever-increasing number of transfers of juveniles for trial as adults all combine to require examination of the juvenile criminal justice system in Chicago, this is obviously a desirable project.

The University has requested a grant of $300,000 to help operate the project for three years. Its budget calls for two attorneys in the first two years, three in the third and a supporting staff of legal secretaries, a paralegal/investigator, a social service coordinator, four summer fellows during the first year and six in the second and third years. It also includes amounts for maintenance and operation of word processing equipment, malpractice insurance, court reporters, court transcripts, psychological and educational testing, travel including out-of-town transportation, and parking. The law school contemplates contributing $650,000 to the project's budget over the three year period.

The court requested the law school's representatives to recognize the limited funds available and to recalculate the amount requested. In a supplemental submission they reiterated the need for a minimum of $300,-000 ($100,000 per year) but, recognizing the limited funds available, said that, if the court could not fund the entire amount, "we will do our best to secure alternative funding to make up the difference."

The court does not intend to second-guess the proposed budget, but it seems obvious that a project starting from scratch will not require, or be able to utilize for some period of time all of the personnel, equipment, services, etc. contemplated for the first year in the projected budget. As to the second and third years, only time will tell what is necessary. Given the several other agencies with which project personnel will be cooperating, it may well be that savings can be achieved.

The court is confident that with "seed" money of $200,000, the law school and the clinic will be able to proceed with this desirable project. A grant in that amount is approved with the condition that not to exceed $50,000 be disbursed in the first year and the balance be invested in U.S. Government bonds or securities of comparable quality which should provide substantial additional funds for the operation of the project in the later years.

### 3. *The Legal Aid Bureau of United Charities (LAB)*

This is the oldest of the applicants, having been established in 1886 for the purpose of protecting the rights of the poor by providing them with counsel and, therefore, equal access to the law.

In addition to its full-time paid staff of 17 lawyers, 6 paralegals and supporting personnel, the LAB enjoys the services of volunteer lawyers and students at John Marshall Law School which does not have an in-house legal clinic. LAB and the University of Chicago Law School Mandel Legal Clinic also work jointly.

There is no question that LAB is a recognized and well-respected provider of legal services to the poor. It largely depends on voluntary contributions to meet its $1.6 million annual budget. Because of reductions in private giving both to the United Way and by many law firms, LAB faces a financial problem. It requests that up to $100,000 be granted to it. Recognizing the importance of its work and its needs, a grant of $50,000 is approved.

### 4. *University of Illinois College of Law*

The University of Illinois Law School has in operation a Minority Access Program through which, starting with college juniors, the program seeks to increase both the number of highly qualified minority law students and the number of minorities in large firm practice. The law school seeks to identify University of Illinois promising minority undergraduates, expose them to four weeks of academic courses in legal analysis, research and writing and four weeks as unpaid interns in law firms or public agencies in the hope that they will decide to attend law school and will ultimately find employment in some of the larger firms. Each participant receives $1,500 to defray in part the loss in summer employment earnings. In addition, the University pays for four weeks housing, books and supplies, which aggregate an additional $1,000. Other expenses bring the current annual cost for 10 participating students to

$45,000. Private firms contribute substantially to that cost and it is anticipated will continue to do so.

The original grant request was for $750,-000 which, it was believed, with annual contributions, would endow the program indefinitely for an annual group of 25 students. The court questioned the necessity for a permanent endowment. Whether or not the program will achieve its objectives remains to be seen since it has not been in operation long enough to evaluate its success.

As a result of the colloquy in court, the representatives of the law school have submitted a revised request for $262,500 which would permit 15 more participants each year for seven years at $2,500 per year. Given the fact that 10 per year is the maximum number who have participated in the program to date and that its efficacy has not yet been demonstrated, doubling the program for five years should be sufficient to determine its value. If it is successful, which the court hopes it will be, substantial financial support for its continuation should be available. Ten additional participants for each of the next five years at $2,500 per participant will require $125,000. That amount is awarded with the condition that it be invested at interest in U.S. government bonds or securities of comparable quality and expended at not to exceed $25,000 per year. That should enable an additional group of 7 to 10 participants in the sixth year.

### 5. *Loyola University of Chicago College of Law*

The Loyola University Law School proposes to establish an Institute for Consumer Antitrust Studies with initial emphasis on the antitrust implications and impact of anticipated industry, state, and federal proposals for national health care reform.

It has presented a comprehensive proposal which outlines the need for such an institute, the importance of the initial inquiry, and the special qualifications of the law school, which include: (1) that it is the home of the Institute for Health Law (IHL) a nationally recognized and respected institution dedicated to studies concerning quality improvement and cost effectiveness in the delivery of medi-

cal, pharmaceutical and other health services, which also publishes the journal Annals of Health Law; (2) the fact that Loyola publishes the Consumer Law Reporter which covers current developments in consumer law by reviewing recent cases and legislation, with emphasis on their impact on consumers, a special annual issue of which is planned to report on the possible antitrust impact of health care reform proposals; and (3) the quality of the members of the faculty who will be involved in the Institute.

The application also includes the extensive curriculum vitae and impressive qualifications of the faculty members and staff who will participate in the activities of the Institute. They include Dean Nina S. Appel, former Dean and currently Professor Charles D. Murdock, Professor John D. Blum, Director of the IHL, Visiting Professor Frank M. Covey, Jr., Professor Jeffry L. Kwall, Assistant Professor Simonetti Samuels, Assistant Professor Lawrence Singer, and Marilyn E. Hanzal, Associate Director of the IHL.

Enthusiastic letters of approval of and support for the Institute have been received by the court from a number of individuals familiar with the antitrust and health fields including the Executive Vice–President of the American Medical Association, the Executive Director of Blue Cross Blue Shield Center for Health Economics and Policy Research, prominent attorneys with expertise in antitrust or health care law and others.

The grant application also spells out the program and procedures to be implemented by the Institute, the responsibilities of the various faculty members and other individuals who will be involved, the substantial contributions which Loyola University and the Law School will make annually in money, services, and facilities to the Institute's operations, and the role which a contemplated Board of Advisors will play. Overall, it is the most comprehensive and detailed grant application received by the court.

It is also the only one which bears any direct relation to the antitrust source of the funds to be distributed. Even under the historic concept of cy pres, this application

would clearly qualify. Using antitrust case funds to study, from the perspective of consumers, the relationship between and the practices of various segments of the economy with initial focus on the health care field is clearly a cy pres utilization of funds remaining from an allegedly illegal price-fixing antitrust case.

The initial request was for a grant of $1,250,000 to provide a minimum endowment for the Institute. At the hearing, the court pointed out the limited funds available to it and the requests of other worthy applicants some of which the Loyola representatives had heard. It also pointed out that it was aware that a number of Loyola Law School graduates had done well financially in the antitrust field and that it believed they, along with others, alumni and non, should be willing to make significant special contributions to enable the school to establish and operate the Institute. It urged the representatives to consult with alumni and others to explore the possibilities.

Under date of May 25, Dean Appel advised the court that they had scrutinized their budget requirements "and additional funding sources available." Accordingly, a revised request was submitted. It reiterates that the initial request for $1,250,000 represents the minimum endowment required for an effective Institute. It goes on to say that the University and the Law School have determined to use their best efforts to raise additional endowment and or current operating funds to produce the income required to operate the Institute. To accomplish this, efforts are being made to obtain substantial gifts from law school alumni, antitrust and health care practitioners and health care organizations and foundations including the American Medical Association Foundation. One law school alumnus has already agreed to spearhead the effort and has personally pledged to contribute $50,000 over five years.

As a result, they are confident that their efforts will be successful and a grant of $750,000 to constitute the nucleus of a $1,250,000 endowment will enable them to establish and operate the Institute. They point out that, while fund raising activities and expenses were not contemplated in the original proposal, Loyola will contribute the staff and resources necessary to raise the additional funds.

The court is impressed both with the proposal and the commitment of Loyal University and its Law School to what could well be a very important project. As an aside, the court believes it to be particularly appropriate that the initial activities of the Institute will include a study of proposed health care programs and their antitrust implications. In 1939, as Senator Robert F. Wagner of New York's assistant, the court, together with Wilbur Cohn, then with the Social Security Administration, but subsequently for many years until his recent death a distinguished professor at the University of Michigan, and others, drafted the first national health bill, known as the Wagner, Murray, Dingell bill after its sponsors, Senators Wagner and Murray and Congressman Dingell. The economics of a national health program were necessarily of great concern, including possible antitrust problems such as price-fixing, maintenance of competition among suppliers of health care services, etc. Now that serious attention is being given to establishing a national health program these concerns remain.

The court recognizes that the $750,000 now requested will be the largest single grant. Without derogating any of the other proposed uses of these antitrust funds, the court believes this is the best and most important cy pres use to which they could be put. Accordingly, subject to the terms and conditions set forth in the original and revised proposals, a grant of $750,000 is made to the Loyola University of Chicago School of Law.

### 6. Chicago Lawyers' Committee for Civil Rights Under Law

The committee, which has been involved since 1969 in a broad range of civil rights issues and which benefits from more than 10,000 hours annually of voluntary legal services provided by many of the city's major law firms, has applied for $105,000 to be used $35,000 in each of three years to support two of its ongoing programs, the Lawyers' School Reform Advisory Project and the Children's Health Advocacy Project.

Both programs are worthwhile as evidenced by the substantial number of hours attorneys devote to them. Additional funds will enable them to be expanded although both will undoubtedly continue without additional funding. Sixty thousand dollars ($60,000) over a three year period should support maximum expansion of both programs. As with other grants to be expended over a period of years, no more than $20,000 of the grant shall be spent in any one year and the balance shall be invested in U.S. Government bonds or comparable securities which will produce additional income to be available in the fourth year.

### 7. *Legal Assistance Foundation of Chicago*

The Legal Assistance Foundation of Chicago (LAFC) is the largest and principal provider in Chicago of free legal services in civil law matters to those unable to afford private counsel, serving approximately 40,000 indigent individuals in 1992 principally through its neighborhood offices located throughout the city. Its annual budget is in excess of $10 million which is principally supplied by the federal government and has been frozen by the Congress.

The LAFC proposes to establish an "Access to Justice Plan" to expand its services in both class actions and individual cases. It is not a new area of concern but an effort to reach more needy individuals requiring legal services. The original request was for $109,000 per year for three years, or a total of $327,000. After the hearing, the request was reduced to $98,000 per year or $294,000.

While the court is cognizant of the effective work which the LAFC performs and sympathetic with its budget and financing problems, it believes that a grant of $150,000 should enable the LAFC to go forward with the Access to Justice Plan. As with other similar grants, it is made on condition that not to exceed $50,000 be spent in any year and that any balance be invested in U.S. Government bonds or comparable securities which will generate substantial additional funds for the fourth year.

### 8. *Roger Baldwin Foundation of the American Civil Liberties Union of Illinois*

The Roger Baldwin Foundation originally filed two grant applications, one for $435,000 to finance a "Race and Poverty Program" for three years, and the second for $550,000 to permanently endow a "Minority Fellowship Program." At the hearing the Court made it clear that there was no possibility that both grants would be funded and requested that the foundation select the one it was most interested in having considered and that the amount requested be reduced to the absolute minimum necessary.

As a result, a revised request has been presented identifying the Race and Poverty proposal as the first choice and reducing the amount requested to $306,900 for three years of operation, $83,500 the first year, $100,000 the second year, and $123,400 the third. It includes the salary of one attorney, half a secretary, fringe benefits, expenses and travel. The single largest item is the salary of $50,000 for the first year, $52,500 for the second and $55,000 for the third year of the attorney.

Consistent with the substantial "seed money" policy previously discussed, a grant of $150,000 is approved with the condition that not more than $50,000 be expended in the first year and any unexpended funds be invested in U.S. Government bonds or comparable securities which should produce additional funds for subsequent years' operation of the Race and Poverty Program.

### 9. *Northwestern University Law School*

Professor Lawrence Marshall of the Northwestern University Law School has been teaching Legal Ethics for the past six years. Based on his experience he has concluded that having students read rules and judicial opinions is inadequate to demonstrate the ethical and moral dilemmas that lawyers face in practice. He proposes, with Professor Stephen Herzberg of the University of Wisconsin Law School, to create a series of short videos consisting, for the most part, of interviews with attorneys who have faced ethical dilemmas. The grant application gives examples such as the dilemma

faced by a lawyer whose client intends to commit perjury.

Professor Lawrence contemplates that the class procedure will be to show the brief video and then discuss the ethical aspects of the particular dilemma using opinions and other written materials in addition to the videotapes. His projected budget is for $120,000 which includes $20,000 for release time for himself and Professor Herzberg, $70,000 for filming and editing the videos and $10,000 for travel.

The court recognizes that teaching Legal Ethics to law students is important and can be dull. Professor Lawrence's attempt to make it more effective is worth a try. He has, however, presented us with only a general proposal and budget. For example, there is no indication of how much each video would cost, or any real detail as to overall costs. In addition, the court has serious reservations about paying the two professors for the time they will spend in creating teaching materials which, like casebooks or textbooks, will undoubtedly be sold commercially to other educators for use in teaching legal ethics.

It may well be that the project can be financed, at least in part, by an advance or advances from some legal publication company which will sell the finished tapes and written materials. In light of the foregoing, the court is confident that a grant of $50,000 will enable the project to proceed at least to the point where its desirability and utility can be demonstrated and any necessary further funds obtained. A grant in that amount is made.

### 10. *San Jose Museum of Art*

The San Jose Museum of Art, having learned that the court was to distribute funds remaining from the settlement of the glass container antitrust case has made an ingenious cy pres grant application. It seeks funds to rent or purchase works of glass art created by one of the pre-eminent glass artists in the world, whose works are respected in art circles and were the subject of the cover article in the February 1992 issue of the Smithsonian Magazine. The Museum has also submitted a brochure issued in con-

junction with an exhibition of his creations displayed at the Honolulu Academy of Arts. The Museum desires to rent or acquire glass works of art and devote a section of a recently completed wing to glass art.

Inasmuch as a number of the sales of glass containers were made in California, the Museum urges that some of the undistributed funds be considered for distribution in that state. The court recognizes the unique cy pres application involved in the request. Believing that the Museum's desire to acquire glass works of art is an appropriate public purpose and that a "seed money" grant from glass container antitrust funds is not inappropriate, a grant in the amount of $50,000 will be made on condition that it be used in conjunction with other funds raised for that purpose to purchase glass works of art to form part of a permanent collection of such works at the Museum.

### 11. *AIDS Legal Council of Chicago*

The AIDS Legal Council originally requested a substantial grant to support its current and anticipated expanded activities. Subsequent to the hearing it submitted a specific proposal which would include reviving the newsletter previously sent to attorneys and AIDS service providers, advertising its availability once a month in both English and Spanish language newspapers targeted to minority communities, and maintaining a minimal library. The budget totals $36,404 and a grant of $30,000 will be made to be used for the purposes set forth in the application.

### 12. *Chicago Volunteer Legal Services*

The Chicago Volunteer Legal Services (CVLS) originally applied for a $500,000 grant to establish a permanent endowment fund, the annual income from which, combined with current contributions would finance its operations.

The court is informed about and approves CVLS's program and activities in assisting, largely through 1600 volunteer attorneys, low-income Chicagoans with legal problems they cannot afford to retain hired counsel to handle. As previously indicated, the court

also recognizes the desirability of organizations like CVLS having endowments which provide a nucleus of the income they require to operate. It agrees that an endowment of $500,000 for CVLS would be very desirable. Given the limited resources available to the court, as discussed at the hearing, and believing that a substantial initial grant should enable CVLS to obtain additional endowment contributions and reach its $500,000 endowment goal, the court will grant $200,000 to CVLS to be held as an endowment, the income from which may be used to support the foundation's operations and activities. The court assumes without making it a condition of the grant that CVLS will promptly embark on a campaign to raise at least an additional $300,000.

### 13. *WTTW*

WTTW/Channel 11, Chicago's public television station applied for an unspecified sum to support its general programming. At the hearing, the court requested the station's representatives to submit a supplemental request containing more specifics. None has been forthcoming.

The original request outlined a wide variety of cultural, educational and public affairs programs which the station airs and many of which it creates and produces. Some of them, at least, would appear to qualify as valid cy pres uses. These include educational programs on the U.S. Constitution, the operation of our legal system, etc. The court is dubious whether an unrestricted grant to WTTW would constitute a valid cy pres use. It is prepared to make WTTW a grant of $25,000 if the station can, within 10 days from the date hereof, present a proposal for application of the grant which falls within the current broad cy pres criteria.

### 14. *American Jewish Congress—Midwest Region*

The American Jewish Congress (AJC) submitted a late grant application seeking support for four separate projects in an aggregate amount of $595,000. Several of the projects are primarily Jewish oriented. One of the four, the Kahn Religious Liberty Resource Center, has several programs which are more broadly focused. Each has its own significance. The Annual Report Card on Religious Liberty, the Television Series on religious liberty, and the Religious Liberty Hotlines are all useful projects and each merits support. The amounts needed to fund all of them are beyond the available funds and the AJC has not indicated any priority or preference between them. Accordingly, a grant of $50,000 will be approved to be used to support such Kahn Center program or programs as the governing council of the AJC–Midwest Region determines.

### 15. *National Association for Public Interest Law (NAPIL)*

As previously indicated, NAPIL has applied for part or all of the funds in question. We have also previously described NAPIL's program and noted that it has already received some 2.3 million dollars from the *Folding Carton* antitrust case and an additional approximately 800,000 dollars from the *Ocean Shipping* antitrust case. We agree with Judge Williams of this court who made the *Folding Carton* grant and Judge Stewart of the Southern District of New York who made the *Ocean Shipping* grant that NAPIL is an appropriate cy pres beneficiary. The court of appeals for this circuit also agrees.

When NAPIL received the substantial grants referred to, it was contemplated that they would in effect be "seed money" and that an endowment of about 50 million dollars would be raised to assure the continuing operation of the NAPIL program. So far as we know, this is still the intention.

A not-for-profit corporation was organized, entitled NAPIL Fellowships, to receive funds to be held as an endowment, the income from which would be used to operate the NAPIL program. $1.5 million dollars of the Folding Carton Settlement Fund was distributed initially to NAPIL Fellowships as an endowment. Subsequently, additional funds were added.

In an effort to add further to that endowment, we will approve a grant of $350,000 to NAPIL Fellowships, the principal and income of which shall be held in a separate trust account pending NAPIL Fellowships'

raising $700,000 of new money within one year after the date hereof for addition to its endowment. At such time as the additional $700,000 in new endowment funds is raised, the $350,000 plus income held in trust as provided herein shall be added to the NAPIL Fellowships endowment so that it will be increased at that time by more than $1,050,000. In the event that the additional $700,000 is not raised within the year, the $350,000 plus the income thereon shall be returned to the court.

### General Provisions

1. Each of the grants is, of course, to be used solely to carry out the objectives set forth in the grant application and is subject to all the conditions contained in the application or in this memorandum.

2. Within ten days hereof, each applicant will advise the court in writing if it accepts the grant and the conditions attached thereto or if there is any reason why it cannot or chooses not to accept the grant authorized herein. Upon any such notification, if no satisfactory solution can be mutually agreed upon, the court will make other appropriate disposition of the funds involved.

3. Each applicant upon receipt of the grant funds will agree to provide the court with a report at the end of six months from the date of receiving the funds detailing the use of any funds expended, the arrangements made for holding and investing unexpended funds and the results accomplished. Six months thereafter a further report will be filed with the court and annually thereafter so long as the grant funds or the income therefrom are being utilized by the grantee. To evidence the receipt of the grant funds and acceptance of the applicable conditions, each grantee will execute a receipt and acceptance form as set forth in Exhibit B attached hereto.

4. An order will be entered specifying the grants awarded as herein provided.

5. Distribution of the granted funds will be made by the LaSalle National Bank subject to the terms and conditions heretofore provided commencing on July 12, 1993.

### ORDER

Pursuant to the Memorandum issued in this case on this same date, subject to the conditions stated therein and upon receiving an executed copy of the attached receipt and acceptance of conditions, LaSalle National Bank is ordered to make the following payments on July 12, 1993:

1. Public Interest Law Initiative: $14,000

   25 East Jackson Blvd.

   Chicago, IL 60604

2. University of Chicago Law School: $200,000

   Mandel Legal Aid Clinic

   1111 East 60th Street

   Chicago, IL 60637–2786

3. The Legal Aid Bureau of United Charities: $50,000

   14 East Jackson Blvd.

   Chicago, IL 60604

4. University of Illinois College of Law: $125,000

   209 Law Building

   504 East Pennsylvania Ave.

   Champaign, IL 61820

5. Loyola University of Chicago College of Law: $750,000

   Water Tower Campus, One East Pearson St.

   Chicago, IL 60611

6. Chicago Lawyers' Committee for Civil Rights: $60,000

   185 N. Wabash Ave., Suite 2110

   Chicago, IL 60601–3607

7. Legal Assistance Foundation of Chicago: $150,000

   343 S. Dearborn Street

   Chicago, IL 60604

8. Roger Baldwin Foundation of the ACLU: $150,000

   Suite 1405, 203 N. LaSalle St.

   Chicago, IL 60601

9. Northwestern University Law School: $50,000

   357 East Chicago Ave.

   Chicago, IL 60611–3069

10. San Jose Museum of Art: $50,000
110 S. Market
San Jose, CA 95113

11. AIDS Legal Council of Chicago: $30,000
220 S. State St., Suite 1330
Chicago, IL 60604

12. Chicago Volunteer Legal Services: $200,000
205 W. Randolph, Suite 510
Chicago, IL 60606

13. American Jewish Congress: $50,000
Midwest Region
22 West Monroe St., Suite 1900
Chicago, IL 60603

14. NAPIL Fellowships: $350,000
1118 22nd Street, NW
Third Floor
Washington, DC 20037

*The Marketplace That Works!*

TO ADVERTISE,
Call toll free:
1-800-FONE WSJ
(1-800-366-3975)

## POSITIONS AVAILABLE

### VICE PRESIDENT OF SALES & MARKETING

E S Robbins Corporation, a medium sized plastics manufacturer and anticipating a rapid growth rate over the next 5 years, is seeking a Vice President of Sales and Marketing.

This top position will coordinate the sales and marketing efforts of our 4 divisions, each serving a different market worldwide. Our newest division is experiencing rapid growth due to newly patented technology that has allowed us to position ourselves in the forefront of a niche market centered in the container/packaging field. Our other markets consist of office products, strip and impact doors and fence line products.

Qualified candidates should have a proven work history in the following areas:

- **Strategic sales and marketing planning and implementation** for existing and new product offerings.
- **Leading a "multi-line" sales organization**, preferably in the consumer packaging and retail markets.
- **Container/Packaging concepts as it relates to new consumer products** being introduced into the market place on a global basis.
- **Must have strong managerial and team building skills** in a TQM environment.
- **Experience in small to medium sized companies** preferred.

The successful candidate will join a highly capable and motivated professional team that is responsive, quality driven and committed to delivering innovation through marketing research and product development.

We offer a competitive salary and benefits program, including a relocation package to the beautiful mountain lakes region of northwest Alabama, where our facility is located, which provides for an environment of quality living. Qualified candidates should send resume in confidence to:

### E·S·ROBBINS
CORPORATION

Human Resources Department-300
2802 E. Avalon Avenue
Muscle Shoals, Alabama 35630
(205) 383-0124
FAX (205) 383-4987

*Equal Opportunity Employer*

### DIRECTOR OF MARKETING

Hazel Ad Specialty, a division of ATAPCO Office Products Group, a premiere-quality office products and business accessories manufacturer, is seeking a professional to develop market share and enhance product profitability for short and long-term growth.

Position responsibilities include developing and implementing the specialty division's marketing strategies in terms of product development, end-user and trade advertising, pricing and promotional programs (including the annual catalog and quarterly newsletter), in addition to developing the marketing budget and recommending R&D expenditures.

The successful candidate must be a degree or have equivalent skills or experience in addition to a minimum of 7 years of experience in either field sales, key account management, or progressive product or marketing management. Team players who thrive in a fast-paced environment should send their confidential resume with salary history and requirements to:

Judy Reed, Human Resources Manager
ATAPCO/Hazel
1200 South Stafford Street
Washington, MO 63090

## Atapco
Office Products Group

*Equal Opportunity Employer M/F/D*

## LEGAL NOTICES

At IAS Part 11 of the Supreme Court of the State of New York, held in and for the County of New York, at the New York County Courthouse, on the 28 day of January 1993

PRESENT:
HONORABLE LEWIS R. FRIEDMAN,
Justice.

---------------------------------------X
In the Matter of the Liquidation of the New York Agency . IAS Part 11
*and Other Assets of the Bank of Credit and Commerce* Index No 43170/91
International, S.A., 530 Fifth Avenue, New York, New York, Justice Friedman
and Petitioner Pursuant to Article XIII of the Banking Law ORDER
---------------------------------------X

WHEREAS the Petitioner Derrick D Cephas, Superintendent of Banks of the State of New York (the "Superintendent"), having moved this Court, by Order to Show Cause dated July 13, 1992 for an order directing the release of $85,219,226 14 plus any accrued interest (the "Funds") from a segregated account at the Bank of New York (the "Segregated Account"), which funds were previously on deposit in New York with Bank America International ("BAI") in accounts of the Tokyo Branch of the Bank of Credit and Commerce International S A ( BCCI SA ), for use by the Superintendent in the liquidation of BCCI SA (the "Application"); and

WHEREAS the Application was served upon all parties appearing in the liquidation proceeding, all parties appearing in the Section 304 proceeding captioned In re Petition of Brian Smouha, et al, No 91-B-13569, pending before the United States Bankruptcy Court for the Southern District of New York, and all parties appearing in the interpleader action previously pending before the United States District Court for the Southern District of New York commenced by BAI with respect to the Funds, and

WHEREAS the Order to Show Cause provided that all parties opposing the Application must file written objections with the Court on or before July 28, 1992, except that the Industrial Bank of Japan Ltd ("IBJ"), CITIC Indusrial Bank ("CITIC"), and the Liquidator of the Tokyo Branch of BCCI SA (the "Tokyo Liquidator") were not required to file such objections at that time since the Superintendent had already acknowledged that they objected to the Application; and

WHEREAS the only objections as filed was from Banco de la Republica, which objection did not relate to the Funds and has since been settled, and therefore, all other parties with actual or constructive notice of the Application are foreclosed from objecting to the Application and

WHEREAS, IBJ's objection to the Application relates to $12 000 000 plus accrued interest from the Funds, CITIC's objection to the Application relates to $11,000,000 plus accrued interest from the Funds (hereinafter for either, the "Disputed Portion"), the Tokyo Liquidator has withdrawn his objection and represented that he is not seeking any of the Funds, and no other person or entity has made any claim of entitlement to any of the remaining $22,219,226 14 of the Funds (hereinafter, the "Undisputed Portion"), except that IBJ and CITIC have asserted the right to obtain satisfaction of any interest award that might exceed the funds remaining in the Disputed Portion and raised other objections to the release of the Undisputed Portion to the Superintendent as set forth at oral argument, but consent to this Order; and

WHEREAS, the Superintendent has represented that he will maintain sufficient funds in the liquidation estate to satisfy any potential interest award to CITIC or IBJ that could not be satisfied solely from the Disputed Portion and

NOW, THEREFORE, It is hereby

ORDERED, that the Application with respect to $22,219,226 14 plus accrued interest attributable to that sum from the Funds is granted, and the Superintendent is authorized to withdraw those funds from the Segregated Account for use by the Superintendent in the above captioned liquidation, provided, however, that

1. A copy of this Order shall be published in the New York Times and the International Edition of The Wall Street Journal once each week for two consecutive weeks commencing on February 2, 1993, and that such publication shall be good and sufficient notice to any person or entity that did not previously have actual or constructive notice of the Application

2. Any objections to this Order or the Application by any party that did not have prior actual or constructive notice of the Application shall be in writing, shall state with particularity the grounds therefor, and shall be filed with the Court and served, by means calculated to ensure receipt not later than February 23, 1993, on counsel to the Superintendent, Cleary, Gottlieb, Steen & Hamilton, One Liberty Plaza, New York, New York 10006, attn., Howard S Zelbo, Esq;

3. The Superintendent represents that he will maintain the Undisputed Portion in the liquidation estate until the time for filing such objections have expired and that in the event any such objections are timely filed, he will maintain the Undisputed Portion in the Liquidation Estate for a further period of time sufficient to permit this Court to resolve any argument that the Undisputed Portion should be returned to the Segregated Account; and it is further

ORDERED, that the Court will take the remainder of the Application under advisement, and it is further

ORDERED, that nothing herein shall grant any rights to any party that previously was given actual or constructive notice of the Application, including, but not limited to, all parties previously served with the Application, whose time to object to the Application has expired

ENTER:
s/ Lewis R. Friedman
LRF

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, Superior Beverage Company, Inc., et al. v. Owens-Illinois, Inc., et al, No. 89 C 5231.

### NOTICE OF HEARINGS

Notice is hereby given that the Court desires to receive suggestions concerning the appropriate cy pres distribution of certain excess settlement and cost funds on deposit in the above case which will be substantial although the exact amounts have not yet been determined. The Court informally seeks the suggestions and assistance of interested educational and charitable institutions, not-for-profit organizations and knowledgeable individuals on possible cy pres uses of these funds.

Oral suggestions will be heard on April 13 and 14 at the United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604, Room 2525, beginning at 10.00 A.M. each day.

The Court advises that participation in the informal hearings will not confer standing on any person or organization, nor will any suggestions become part of the record in the case The Court also reserves the right to limit the persons to be heard The Settlement Agreement in this case directs the Court in its discretion to dispose of excess funds in accordance with the cy pres doctrine and the Court is desirous of considering any appropriate suggestions.

Interested participants should write to the Court on or before March 26, 1993, at the address indicated below to notify the Court of their desire to be heard with a brief written summary of the substance of their suggestions.

The Honorable Hubert L Will
Senior District Judge
U.S. District Court for the
Northern District of Illinois
219 South Dearborn Street
Room 2578
Chicago, Illinois 60604
Re: Superior Beverage Company, Inc, et al

A schedule will then be prepared and those individuals or organizations to be heard will be notified as soon as possible thereafter. Oral presentations of 15 minutes or less will be heard. Written presentations in addition to the brief summary may be submitted on or before March 26, 1993, but are not required.

In due course after the hearings, the Court will make and announce its cy pres dispositions of the funds in question.

EXHIBIT B

*Receipt and Acceptance of Conditions*

The undersigned —————— hereby accepts a grant from the Glass Container Antitrust Reserve Fund in the amount of $——— subject to the terms and conditions set out in its grant application and in the court's Memorandum dated June 22, 1993 and acknowledges receipt of the $——— this —— day of ———, 1993. The acceptance of the grant and the conditions thereof have been approved as required by the undersigned organization's governing documents.

——————

By ————

Dated: ———