### In re: MOTORSPORTS MER-CHANDISE ANTITRUST LITIGATION

No. MDL 1212.
No. CIV.A.1:97CV2314TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 16, 2001.

Craig G. Harley, Chitwood & Harley, Atlanta, GA, for plaintiff.

William O'Bryan, Howrey & Simon, Washington, DC, Willaim L. Tucker, Page Scrantom Sprouse, Tucker & Ford, P.C., Columbus, GA, Ben Sirmons, Frazier Frazier & Mahler, Greensboro, NC, Halsey Knapp, Foliz Martin, Jeff Cashdan, King & Spalding, Emmet Bondurant, Bondurant Mixson & Elmore, Peter Coffman, Dow Lohnes & Albertson, Atlanta, GA, for defendants.

### ORDER

THRASH, District Judge.

This is a consolidated class action antitrust case transferred to this Court by the Judicial Panel on Multidistrict Litigation. It is before the Court on the Plaintiffs' Motion for Approval of Plan of Allocation [Doc. 265]. In an order dated January 17, 2001, the Court approved Plaintiffs' distribution plan as to the coupon portion of the class settlement. The Court, however, reserved ruling on the portion of Plaintiffs' plan of allocation which proposed distribution of excess settlement funds to charity. That part of the class settlement is addressed in this order. The Court approves and directs the distribution of settlement funds to the charities as set out below.

### I. BACKGROUND

In this action, Plaintiffs allege a combination and conspiracy among Defendants to fix prices of NASCAR race souvenirs. On August 25, 2000, after an extended period of litigation, this Court approved settlement agreements between Plaintiffs and the Defendants. The settlement agreements required Defendants to pay more than $5.6 million in cash and issue more than $5.7 million in coupons to the class. According to the terms of the settlement, the precise plan of allocation would be submitted to the Court after the deadline for submitting claims. Claims were submitted for substantially less than the cash amount of the settlement. After the dead-

line for submitting claims, Plaintiffs proposed that the net cash be allocated and used as follows:

A. To pay incentive awards of $5,000 in cash to each of the seven named class representatives;

B. To return ticket stubs, photographs, and other souvenir-type proof of qualifying purchases that were sent by claimants to the Claims Administrator;

C. To pay cash awards to claimants in the amount of 100% of their claimed purchases; and

D. To make *cy pres* awards to charitable organizations

In addition, Plaintiffs proposed to mail to all claimants coupons in amounts equivalent to their cash awards, and to pay additional coupon incentive awards to the named class representatives in the face amount of $1,000 each. Some of the Defendants object to the proposed *cy pres* distribution, arguing instead that the unclaimed settlement funds should be returned *pro rata* to the Defendants.

### II. DISCUSSION

It is not uncommon in consumer class actions to have funds remaining after payment of all identifiable claims. As a result, a fairly extensive body of caselaw has developed on the subject of their appropriate disposition. "[N]either the class members nor the settling defendants have any legal right to unclaimed or excess funds." *Powell v. Georgia–Pacific Corp.*, 843 F.Supp. 491, 495 (W.D.Ark.1994); *Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 812 (5th Cir.1989); *In re Folding Carton Antitrust Litigation*, 744 F.2d 1252, 1254 (7th Cir.1984). Where no legal claim to settlement benefits exists, a court can exercise its equitable powers to distribute the remaining funds. *Powell*, 843 F.Supp. at 495. In general, the courts have considered four options when faced

with unclaimed settlement funds: *cy pres* distributions; *pro rata* distribution to class members; escheat the funds to a governmental body; and reversion to defendant. *Id.;* 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §§ 10.13 to 10.25 (3d ed.1992).

■ Where settlement funds remain after distribution to class members, courts have approved charitable donations to organizations geared toward "combating harms similar to those that injured the class members. Such a donation may serve the cy pres principle of indirectly benefitting all class members." *Jones v. National Distillers,* 56 F.Supp.2d 355, 358 (S.D.N.Y.1999); *see also, West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970). Courts have expanded the *cy pres* doctrine to also permit distributions to charitable organizations not directly related to the original claims. *Superior Beverage Co. v. Owens–Illinois,* 827 F.Supp. 477, 478–79 (N.D.Ill.1993). "The absence of an obvious cause to support with the funds does not bar a charitable donation." *Jones,* 56 F.Supp.2d at 359. Although the "use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and the courts' broad equitable powers now permit the use of funds for other public interest purposes by educational, charitable, and other public service organizations." *Id.,* (quoting *Superior Beverage,* 827 F.Supp. at 478–79). In fact, courts have approved charitable donations to nonprofit groups unrelated to the plaintiffs' original claims. *See e.g., Superior Beverage Co.,* 827 F.Supp. at 478–79 (approving grants from unclaimed class settlement funds to legal aid bureau, various law school programs, a museum, a public television station, and other charities); *In re Folding Carton Antitrust Litigation,* 1991 WL 32867 (N.D.Ill. Mar.5, 1991) (distributing unclaimed antitrust class settlement funds to National Association for Public

Interest Law (NAPIL) for fellowships unrelated to antitrust law).

■ The Defendants who oppose the plan of allocation object to the distribution of settlement funds to charity. Instead, they argue that the funds should be returned, *pro rata,* to the Defendants who contributed to the settlement. Specifically, a small group of "itinerant vendors" assert that because they could not afford to mass the resources of other litigants, they had to ride the coat-tails of the larger Defendants. Now they argue that the Plaintiffs have been overcompensated and that use of the settlement funds to make charitable contributions is patently unfair. They argue that because the settlement documents do not address the issue of distribution of excess settlement funds, the Plaintiffs have served their intended purpose, and the Court should use its equitable powers to return the surplus. The Defendants cite to §§ 10.20 and 11.17 of *Newburg on Class Actions* in support of this proposition. Section 10.20 is not applicable to the current case as it addresses *cy pres* distributions in an adjudicated class action context. The case cited by Newburg in § 10.20, *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005 (2d Cir.1973), reversed a district court decision that granted class certification on a fluid recovery or *cy pres* theory. A fluid recovery or *cy pres* system is utilized where the individuals injured are not likely to come forward and prove their claims or cannot be given notice of the case. *Simer v. Rios,* 661 F.2d 655, 675 (7th Cir.1981). Under such a system, the money is either distributed through a market system in the way of reduced charges or is used to fund a project which will likely benefit the members of the class. *Id.* In *Eisen,* the court rejected the use of a fluid recovery system because it was only under this method that the class could be certified. *Eisen,* 479

F.2d at 1017 (plaintiff and his counsel concede that the class was not manageable unless the "fluid recovery" procedures were adopted). Because the class suffered from manageability problems, the district court adopted the fluid recovery system in order to alleviate these problems. *Eisen v. Carlisle & Jacquelin,* 52 F.R.D. 253, 264 (S.D.N.Y.1971). The Second Circuit reversed holding that a fluid recovery system could not be utilized to certify a class because it was not contemplated by Rule 23. *Eisen,* 479 F.2d at 1018. However, the *cy pres* distribution which Plaintiffs seek to apply in the present case does not suffer from the same deficiency as in *Eisen.* In § 11.20, Newburg explains that while courts are typically reluctant to authorize *cy pres* distributions in a litigated class action context, as was the case in *Eisen,* when done in connection with a class action settlement, "these distributions have obtained a stamp of approval." *Newberg,* § 11.20 at 11–27. Although a Rule 23 class cannot be certified using a fluid recovery or *cy pres* theory, excess funds can by distributed in such a manner once a settlement between the parties has been reached.

Also, arguing that the Plaintiffs' proposal is unfair, Defendants assert that the itinerant vendor Defendants do not care to have their money spent in the fashion outlined in the plan of allocation. They argue that the Plaintiffs should contribute their own funds to the charities that they wish to benefit. The Court does not agree with the Defendants' arguments. Despite the Defendants' attempt to characterize themselves as unwitting participants in the settlement agreements, they undoubtedly entered into them willingly. The Defendants may not now assert that they did not agree with the settlement. Additionally, the Defendants did not receive nothing for something. In exchange for the settlement amount, Defendants obtained release from liability with respect to the class members. As stated by Newberg:

> Because the defendant has already conceded its potential out-of-pocket exposure for the entire potential recovery fund as part of the settlement, the substantive policies underlying the statutes upon which the plaintiffs sued would dictate a preference for an appropriate cy pres distribution rather than a reversion of undistributed funds to the defendant, the alleged wrongdoer, despite any disclaimer of liability in the settlement.

*Newberg,* § 11.20 at 11–29. Therefore, the Defendants' argument that they are somehow deprived of the benefit of their bargain is unavailing. The settlement not only compensated those Plaintiffs who made claims to the fund, but also relieved Defendants of liability from Plaintiffs' individual claims. Presumably, the cost of avoiding even longer and more protracted litigation was also factored into the settlement agreement. For these reasons, the remaining funds should not revert back to the Defendants.

■ Plaintiffs have advised the Court that after deducting distributions to class members, fees and expenses, there remains approximately $2,400,848 in unclaimed settlement funds available for a *cy pres* distribution. After the hearing, the Court solicited proposals from the charitable organizations proposed by the parties and a few others. After considering the submissions of the parties and the charitable organizations, the Court approves distributions of $250,000 to nine different charities. One additional charity will receive a distribution of $100,000. Other non-profit groups are undoubtedly equally deserving. In general, the Court has attempted to identify charitable organizations that may at least indirectly benefit the members of the class of NASCAR racing fans. The Court will briefly de-

scribe each charity chosen, its impact upon the community and the proposed use of the settlement funds.

### 1. *THE MAKE–A–WISH FOUNDATION*

The Make–a–Wish Foundation of Greater Atlanta and North Georgia, 1230 Johnson Ferry Rd., Suite E–30, Marietta, GA 30068, grants wishes to children between 2½ and 18 years of age with life-threatening illnesses. The Foundation aims to enrich the human experience of the children and simultaneously combat the enormous pressures faced by families whose lives are disrupted by the possibility of losing a child. With a donation of $250,000, the Make–a–Wish Foundation estimates that it can fulfill the wishes of 44 children with life threatening illnesses in the year 2002.

### 2. *THE AMERICAN RED CROSS*

The Atlanta chapter of the American Red Cross, 1955 Monroe Dr., Atlanta, GA 30324–4889, provides to local communities a myriad of services that range from disaster relief, to health and safety services, to youth development programs. Perhaps the most noticeable support by the Red Cross is that given in the wake of natural disasters. Following any tornado, hurricane, fire or flood, the Red Cross responds immediately to provide food, shelter, clothing and other essential items for people left homeless, and provides counseling for people traumatized by these events. In addition, in 2000, the Red Cross also reached nearly 350,000 people with health and safety programs. Courses range from CPR and first aid to water safety and HIV/AIDS prevention education. Additionally, the Red Cross offers youth development services. The chapter provides opportunities for metro-area schools to enhance relationship skills with family members, peers, schools, and the community-at-large. Programs are offered in every public school system in the 16–county area

served by the Atlanta chapter. Finally, the American Red Cross provides armed forces emergency services and international relief services. In 2000, Atlanta's Red Cross provided crisis assistance with tracing, emergency messages, family reunification, counseling and referrals for more than 4,100 families, including members of the military and those separated by international conflict. A distribution to the Atlanta chapter of the American Red Cross will help further these important services.

### 3. *RACE AGAINST DRUGS*

Race Against Drugs, 466 Champagne Circle, Port Orange, Fla. 32127, is a nationwide drug prevention education program aimed at educating young people about the dangers of substance abuse. The RAD program would use the $250,000 distribution to fulfill the financial needs of producing and marketing several products and drug prevention materials; including completing the evaluation and pilot testing of the science based *Stay on Track* curriculum, creation of a new kindergarten through second grade coloring book designed to promote reading skills while delivering an age appropriate drug prevention message, creation of a comic/story book for grades three through five designed to stimulate young minds by delivering a clear drug prevention message using motor sports celebrities and stories with a moral guidance, and creation and distribution of the proposed drug prevention posters designed to stimulate young minds and reinforce the drug-free lifestyle message delivered by RAD motor sports celebrity spokespersons.

### 4. *CHILDREN'S HEALTHCARE OF ATLANTA*

Children's Healthcare of Atlanta, 1680 Tullie Circle, NE, Atlanta, GA 30329–2321, is the result of the merger between Egleston Children's Hospital and Scottish Rite Children's Medical Center in 1998. With

the distribution proposed by the Plaintiffs' plan of allocation, Children's Healthcare of Atlanta would purchase three Digital Video EEG Monitoring Systems with Reader Station Software for use in the Neurophysiology clinic laboratory. This video monitoring system is used to diagnose the location and cause of seizures in the Hospital's neurophysiology patients. These patients are children with brain-related disorders ranging from brain tumors to muscular dystrophy to neuromuscular diseases. EEGs view the brain's electrical activity to detect irregularities. If a patient's seizure is observed while he or she is connected to an EEG, the exact casual location can be pinpointed. Neurophysiology patients treated at Children's Healthcare range in age from newborn through older adolescents. Approximately 100 neurology patients each year qualify as candidates for video monitoring and will benefit from this equipment.

### 5. THE ATLANTA LEGAL AID SOCIETY

Founded in 1924, the Atlanta Legal Aid Society, 151 Spring St., NW, Atlanta, GA 30303–2097, serves a five-county metropolitan Atlanta area with four fully staffed and two satellite offices. Last year, the office represented over 17,000 clients on legal issues critical to their daily lives. Its staff of 50 attorneys provided clients protection against domestic violence, helped secure child support and other benefits to which they were legally entitled, defended them against the loss of their homes and protected them against abusive loans and fraudulent sale practices. The $250,000 distribution to Atlanta Legal Aid would be added to an endowment fund which would ensure that Atlanta Legal Aid could continue providing legal services to low income clients. This endowment is meant to furnish the Atlanta Legal Aid with meaningful protection against cuts in federal funding. With the contribution from the Motorsports Settlement, Atlanta Legal Aid

hopes to match the grant with individual gifts from supporters and other contributions. If successful, the award and matching contributions could bring the value of the Atlanta Legal Aid endowment up to $4 million. This total is equivalent to the Society's initial endowment goal as it is enough to replace even the complete loss of federal funding for two full years while replacement funds could be developed.

### 6. THE GEORGIA LEGAL SERVICES PROGRAM

The Georgia Legal Services Program, 1100 Spring St., NW, Suite 200–A, Atlanta, GA 30309–2848, is similar to the Atlanta Legal Aid Society. GLSP provides free legal services to low income clients in the 154 Georgia counties outside the 5 county area served by Atlanta Legal Aid. GLSP staff have provided free legal assistance to more than 350,000 low income clients throughout rural Georgia. The Program operates a number of special projects, including the Domestic Violence Project, which helps victims of family violence obtain restraining orders, address property and children's issues, and secure supportive services to end the cycle of abuse and reconstruct their lives; the Housing Hotline, a toll-free, statewide line through which callers receive information on resolving landlord/tenant problems; homeless advocacy projects; AIDS advocacy projects; elder law projects and many others. The distribution will be used by GLSP to assist in the purchase of a building to house the Program's Macon staff. The Program has negotiated a lease-purchase option on a building in downtown Macon which requires the Program to raise $700,000 by October, 2002. This is the first office building that GLSP has ever purchased, and will help it shift rental costs to the Program's substantive work.

## 7. *KIDS' CHANCE*

KIDS' CHANCE, P.O. Box 623, Valdosta, GA 31603–0623, provides educational scholarships in the form of direct financial aid to children whose parents have been seriously or catastrophically injured or killed in work-related accidents in Georgia. This organization was started in 1988 by the Workers' Compensation Section of the Georgia Bar. The Georgia organization has awarded 220 scholarships since 1988. Scholarship awards vary for high school, technical school and college depending on the needs and educational expenses of the student. Scholarships may cover tuition, books, housing, meals, transportation and/or supplement the income of the family to compensate for monies the student would earn by dropping out of school. The organization awards scholarships for one year provided the student maintains acceptable grades each term. The proposed distribution would be used for an endowment fund to fund future scholarships in perpetuity.

## 8. *DUKE CHILDREN'S HOSPITAL AND HEALTH CENTER*

Duke Children's Hospital and Health Center, DUMC 3352, Durham, NC 27710, is part of the Duke University Medical Center. The primary goal of Duke Children's Hospital is to provide excellent, comprehensive clinical services to infants and children in this community, in the state and the nation, by developing leading edge programs. Duke Children's Hospital also strives to educate well-rounded primary care physicians as well as specialty physicians that contribute new knowledge to their discipline while providing superior patient care. Finally, the Hospital fosters interdisciplinary research programs that involve clinical and basic sciences, particularly in the areas of cardiology, human development, hematology-oncology, genetics, host defenses, and neurosciences. Duke Children's Hospital proposes to use the settlement distribution to further this tripartite mission.

## 9. *THE LAWYERS FOUNDATION OF GEORGIA*

The Lawyers Foundation of Georgia, 800 The Hurt Building, 50 Hurt Plaza, Atlanta, GA 30303, is a strictly voluntary philanthropic arm of the State Bar of Georgia. Last year, challenge grants provided by the Lawyers Foundation to local and voluntary bars and the sections of the State Bar of Georgia procured law related educational materials for schools, funded a training video for high school mock trials, financed a public awareness campaign for Georgia Legal Services, and assisted the Diversity Program of the State Bar of Georgia. The organization also participated in and supported Service Juris, a day when nearly 400 attorneys joined forces with Hands on Atlanta to renovate, repair and rejuvenate an elementary and middle school in West Atlanta. Both the challenge grants and Service Juris will be repeated this year. A grant from the Motorsports settlement would be used by the Lawyers Foundation to continue its mission of funding outstanding projects around the state. The Foundation will also likely increase its endowment, which will ensure that the charitable actions will continue in the future.

## 10. *SUSAN G. KOMEN BREAST CANCER FOUNDATION.*

Finally, the Court orders $100,000 of the settlement proceeds distributed to the Susan G. Komen Breast Cancer Foundation, 5005 LBJ Freeway, Suite 250, Dallas, TX 75244. This Foundation was established in 1982, and, through a network of over 70,000 volunteers working through affiliates across the country and abroad, seeks to eradicate breast cancer as a life-threatening disease by advancing research, education, screening and treatment. The types of innovative research projects funded by the Foundation are: dissertation

grants for doctoral candidates in the health and social sciences to conduct breast health or breast cancer research; post-doctoral fellowships to recruit and retain young scientists in the field of breast cancer research; basic, clinical and translational breast cancer research; imaging technology research to develop and improve breast cancer screening methods for early detection and diagnosis of breast cancer; research to address the unique needs of breast cancer survivors; and epidemiological research to address the disparities that exist in breast cancer incidence and mortality rates among specific populations. The $100,000 distribution would continue to carry out such projects as these.

## III. CONCLUSION

In summary, the Court approves a *cy pres* distribution in the amount of $250,000 to each of the following nine charities: Make–a–Wish, The American Red Cross, Race Against Drugs, Atlanta Legal Aid, Children's Healthcare of Atlanta, Georgia Legal Services Program, KIDS' CHANCE, Duke Children's Hospital and Health Center, and the Lawyers Founda-

tion. An additional distribution of $100,000 is approved for the Susan G. Komen Breast Cancer Foundation.

Plaintiffs' counsel are authorized and directed to have checks in the appropriate amount issued to the charitable organizations identified above. Each such check is to be accompanied with a copy of this Order and a written acknowledgment to be signed by the chairperson or executive director of the organization. The signed written acknowledgment is to be returned to Plaintiff's counsel and filed with the Court. Acceptance of the distribution shall constitute an undertaking by each organization to use the funds in the manner proposed to the Court and summarized in this Order. After payment of taxes and all additional administrative costs, any remaining settlement funds are to be distributed in equal amounts to the Atlanta Legal Aid Society and the Georgia Legal Services Program after providing notice to the Court.