**In the Matter of Harold TARRER and Marsha Tarrer, Debtors.**

**No. 95–10585–WHD.**

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

Oct. 1, 2001.

Reconsideration denied Jan. 3, 2002.

Jacquelyn L. Kneidel, Wood, Odom & Edge, P.A., Newnan, GA, for Debtors.

Frank C. Jones, James A. Pardo, Jr., King & Spalding, Atlanta, GA, for Primerica Financial Services, Inc., Primerica Life Insurance Company, Massachusetts, Indemnity and Life Insurance Company, PFS, Investments, Inc., PFSL Investments Canada, Ltd., Citigroup Inc.

Kevin S. King, Dietrick, Evans, Scholz & Williams, LLC, Atlanta, GA, for Arthur L. Williams, Jr.

### ORDER

W. HOMER DRAKE, Jr., Bankruptcy Judge.

Before the Court is the Debtors' "Motion to Reopen Chapter 13 Case," in which Harold and Marsha Tarrer (hereinafter the "Debtors") ask the Court to reopen

their case for the purpose of amending their schedules to add an asset. On May 23, 2001, Primerica Financial Services, Inc., Primerica Life Insurance Company, Massachusetts Indemnity and Life Insurance Company, PFS Investments, Inc., PFSL Investments Canada, Ltd., Citigroup, Inc., and Arthur L. Williams, Jr. (collectively, the "Objecting Parties") filed an objection to the Debtors' motion. After a hearing on July 17, 2001, the Court took the case under advisement. Additionally, the Court requested the parties to address the issue of whether the Objecting Parties have standing to object to the Debtors' motion. This matter constitutes a core proceeding, see 28 U.S.C. § 157(b)(2)(A) and (O), and will be disposed of in accordance with the following reasoning.

## FINDINGS OF FACT

The Debtors commenced the present case by filing a petition pursuant to Chapter 13 of Title 11 of the United States Code on March 13, 1995,[1] and the Debtors' plan was confirmed on May 1, 1995. The plan provided for a 1% dividend to unsecured creditors and full payment of secured claims. The Debtors received a discharge on April 14, 2000 from approximately $105,000 of unsecured debt, and the case was closed on September 20, 2000.

At the time of filing, Mr. Tarrer (hereinafter the "Debtor") operated an insurance business, which he had begun as an independent insurance agency in 1977. [Transcript of Hearing on Motion to Reopen at 13]. At some point in time, his agency became affiliated with Primerica. In March 1995, the Debtor appears to have

believed that he had some basis for a claim against the Objecting Parties, which arose in part from actions taken by the Objecting Parties as early as the mid–1980s. [Id. at 28]. In support of this conclusion is the Debtor's testimony at the hearing, in which he stated that he spoke to his attorney, Mr. Shapiro, about whether or not he should include the potential claim as an asset on his bankruptcy schedules. [Id. at 12, 29, 30]. However, the Debtor also testified that Mr. Shapiro had told him that the claim against Primerica was "some kind of asset that [he] really couldn't get" and assured him that he need not list the claim on his schedules. [Id. at 12, 50]. While the Court never entered an order authorizing Mr. Shapiro to withdraw from the case, the Debtor testified that Mr. Shapiro "abandoned" his case about one and a half years after he filed it. [Id. at 6, 10].[2]

In February 1996, the Debtor received notice from Primerica that, under a new program, an ownership interest in his "book of business" had vested in him on January 1, 1996. [Id. at 36]. This ownership interest was referred to as a "code number." [Id.]. The Debtor did not amend his bankruptcy schedules to reflect the receipt of this new asset, nor did he bring it to the attention of the Chapter 13 Trustee [hereinafter the "Trustee"]. [Id. at 38, 51]. The Debtor attempted to sell his ownership interest shortly after he received it in 1996. [Id. at 20]. He claims that, on three separate occasions, he had arranged for the sale of his business and his ownership interest in Primerica, and on

---

1. This case followed an earlier Chapter 7 bankruptcy filed by Mr. Tarrer on June 1, 1990, through which Mr. Tarrer received a discharge of his debts on January 9, 1991.

2. The pleadings filed in this case corroborate this statement. Although the Debtor was rep-

resented by counsel as late as July 10, 1996, the Debtor filed an amendment to his plan on October 24, 1996, and listed "self" as "Attorney for Debtor." The docket does not reflect any further involvement by counsel.

all three occasions, Primerica refused to approve the sale. [*Id.* at 15–16]. This failure to approve the sale apparently forms the basis for part of the Debtor's current claim against the Objecting Parties.

At some point, the Trustee received in the mail from an anonymous source a packet of information, which detailed the Primerica ownership program and alerted her to the Debtor's new ownership interest in his code number. [*Id.* at 17]. On September 6, 1996, the Trustee sent a letter to the Debtor inquiring as to the status of this new asset. [*Id.* at 21]. The Debtor responded by letter on September 23, 1996, to which he attached a letter from a representative of Fields Financial Support, Ms. Karen Wilson, in which Ms. Wilson denied the Debtor's request to sell his code number. [*Id.* at 22]. The Trustee and the Debtor corresponded by letter again on October 29, 1996 and November 1, 1996, at which time the Debtor informed the Trustee that Primerica was continuing to prohibit him from selling his business. [*Id.* at 23].

The Debtor contends that he explained his troubles with Primerica to the Trustee and told her that, if he were successful in selling his code number, he would notify her. [*Id.* at 25]. The Trustee advised the Debtor that he would need to inform the Court before pursuing any litigation against the Objecting Parties and ex-plained that the Court would need to approve the hiring of any attorney representing him in the matter. [*Id.* at 33].[3] The Trustee could not independently recall any correspondence or telephone calls that she had with the Debtor and, therefore, could not recall whether she had advised him that he needed to amend his schedules to reflect the claim or his new ownership interest in his code number. [*Id.* at 71]. She was fairly certain, however, that this advice was not communicated to the Debtor in the above-mentioned letters. [*Id.*]. Despite the fact that the Debtors amended their plan and Schedules I and J on May 17, 1996, they never amended their schedules to reflect either the claim or the code number as an asset.[4]

During the hearing on the Debtors' motion to reopen the case, counsel for the Objecting Parties noted that a comparison of the Debtor's tax returns for 1993 and 1994 with his initial Schedule I indicated that the Debtor listed only approximately $30,000 of gross income for those years, while his tax returns reflect gross income of approximately $63,000. [*Id.* at 46, 54]. During cross-examination, the Debtor confirmed that he had disclosed less than half of his gross income from 1993 and 1994 on his initial Schedule I. [*Id.*]. It should be noted, however, that his schedule of current income did reflect a monthly income gross figure of $5,000. Additionally, The

---

3. According to the docket, this Court never approved the appointment of special counsel.

4. The Debtors amended Schedules I and J on May 17, 1996 to reflect a decrease in monthly gross income, to provide for payroll tax deductions not previously accounted for, and to reduce the office expenses listed to reflect the fact that the Debtor had begun working from his home. The Trustee filed a motion to dismiss the Debtors' case on March 20, 1996. Among other grounds, the Trustee cited the fact that the Debtors' plan would not pay out within 60 months. This was apparently due to the fact that the Debtor's liability for back taxes had been drastically underestimated. On October 24, 1996, the Debtors amended their plan to increase plan payments from $680 to $1340. The Debtor is convinced that he initially discovered that the plan would not pay out within 60 months and volunteered to increase plan payments. [Hearing Transcript, at 11–12]. While the Trustee's records do not reflect the fact that the Debtor contacted the Trustee's office, the Trustee acknowledged that he may have done so. [*Id.* at 69].

Debtor testified that, at some time prior to June 1998, he contacted the Trustee and asked her to explain what would happen in his case if he used funds borrowed from family members to pay off the remaining balance of his plan. [*Id.* at 39]. He then acknowledged that the Trustee had written to him, cautioning him against using money from sources other than his personal earnings to pay plan payments or incurring debt without approval of the Court. [*Id.* at 41]. In his defense, the Debtor explained that he was not "trying to beat anybody out of anything," but merely wanted to be done with the bankruptcy case and to receive some "closure." [*Id.* at 39–40].

On August 12, 1999, the Debtor, along with six other plaintiffs, commenced a consolidated arbitration proceeding against the Objecting Parties. [*Id.* at 27, 56]. This arbitration was later abandoned because the Objecting Parties filed a motion, the favorable resolution of which would have required each of the plaintiffs to file his or her own individual case. [*Id.* at 56]. The Debtor commenced a substantively similar arbitration proceeding against the Objecting Parties in August 2000. [*Id.* at 28].

In December 2000, the Objecting Parties moved to dismiss the arbitration proceeding on the ground of judicial estoppel. [*Id.* at 45]. The Objecting Parties contend that because the Debtor has taken a position in his bankruptcy case (that he had no unliquidated causes of action at the time he filed his petition) contrary to the position he is taking in the arbitration (that he has a claim against the Objecting Parties), he is barred from pursuing his claim. On May 1, 2001, the Debtors filed the instant motion, requesting that the Court reopen their Chapter 13 case and allow them to amend their schedules to add the claim as an asset and to amend their Chapter 13

Plan. The Debtors suggest that this action would allow the Trustee to recover an additional amount of money that could be used to repay approximately $105,000 of unsecured debt, from which the Debtors received a discharge. The Objecting Parties contend that the Court should not allow the Debtors to reopen the case and amend their schedules because the Debtors acted in bad faith when they failed to disclose fully the existence of the claim on their schedules during their bankruptcy case.

### CONCLUSIONS OF LAW

#### A. *Whether the Objecting Parties Have Standing*

As a preliminary matter, the Court must determine whether the Objecting Parties have standing to appear and oppose the Debtors' motion. The Court may consider the issue of whether a party has standing *sua sponte*. *Bischoff v. Osceola County, Florida*, 222 F.3d 874 (11th Cir.2000). Section 350(b) of the Bankruptcy Code provides that the Court may reopen a closed case in order to administer assets, accord relief to the debtor, or for other cause. 11 U.S.C. § 350(b). Bankruptcy Rule 5010 identifies the parties who may move the Court to reopen a case. FED.R.BANKR.P. 5010 ("a case may be reopened on motion of the debtor or other party in interest"). While neither § 350(b) nor Rule 5010 identify the parties who have standing to object to such a motion, it has been held that a "party in interest" may object to a motion to reopen a Chapter 11 case. *See In re Ronald Koch*, 229 B.R. 78, 81–82 (Bankr.E.D.N.Y.1999) (noting that § 1109(b) provides that a party in interest may raise and may appear and be heard on any issue in a Chapter 11 case). Despite the fact that § 1109(b) does not apply to a Chapter 13 case, this Court finds no reason to assume that the same

standard of a "party in interest" should not be applied in a case under Chapter 13.

■■■ Although the term "party in interest" is not defined in the Bankruptcy Code or Rules, § 1109(b) contains a non-exclusive list of examples of what persons or entities may be considered to be a party in interest, which list includes the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder or any indenture trustee. 11 U.S.C. § 1109(b). It is well established that the term is "to be construed broadly, in order to allow parties affected by a Chapter 11 case to appear and be heard." *In re Public Service Co. of New Hampshire*, 88 B.R. 546, 550 (Bankr.D.N.H.1988) (citing *In re Johns–Manville Corp.*, 36 B.R. 743 (Bankr. S.D.N.Y.1984) (other citations omitted)).

■■■ Additionally, because bankruptcy courts are federal courts, general concepts of constitutional standing also apply to bankruptcy proceedings. Therefore, a party wishing to participate in a bankruptcy proceeding must: 1) have suffered an actual injury or show the imminence of such injury; 2) establish that the injury is fairly traceable to the conduct at issue; and 3) demonstrate that the requested relief is likely to redress the injury. *See Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *E.F. Hutton & Co. Inc. v. Hadley*, 901 F.2d 979, 984 (11th Cir.1990). Compliance with these factors essentially establishes that a party requesting to participate in the proceeding has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." *Duke Power Co. v. Carolina Environmental Study Group*,

438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

■■■ In this case, if the Court were to deny the Debtors' motion, it is likely that the Objecting Parties would succeed in having the Debtor's claims summarily dismissed. If the Court were to grant the motion, the Objecting Parties could lose this opportunity and would probably be forced to proceed to defend themselves against these claims. The Court finds that, notwithstanding the fact that the Objecting Parties are neither debtors, creditors, or trustees in a bankruptcy case, their interest in avoiding a long and potentially expensive litigation on the merits is a sufficiently concrete interest to support a finding that they are parties in interest for the purpose of objecting to the Debtors' motion to reopen. Additionally, if the Court grants the pending motion, the Objecting Parties' potential loss of its judicial estoppel defense would be an imminent injury directly traceable to the Court's decision. Finally, the relief requested by the Objecting Parties in this proceeding, that is the denial of the Debtors' motion, would redress this injury. Having determined that the Objecting Parties have standing to object to the Debtors' motion, the Court now turns to the substance of that motion.

B. *Whether the Debtors' Case Should Be Reopened*

■■■ As noted above, § 350(b) of the Bankruptcy Code permits a bankruptcy case to be reopened "to administer assets, to accord relief to the debtor, or for other cause." *See generally* Fed.R.Bankr.P. 5010 ("[a] case may be reopened on motion of the debtor or other party in interest pursuant to section 350(b) of the Code."). By its reference to "cause," § 350(b) casts a broad net, and a decision in this respect

thus necessarily falls within the "sound discretion of a bankruptcy court." *See In re Sheerin*, 21 B.R. 438, 439–40 (1st Cir. BAP 1982); *see also In re Daniel*, 205 B.R. 346, 348 (Bankr.N.D.Ga.1997). The Court must consider the facts presented in each case and use its discretion to determine whether cause exists to reopen the case. *In re Koch*, 229 B.R. 78, 88 (Bankr. E.D.N.Y.1999) ("The bankruptcy court should exercise its discretion, based upon the peculiar facts present and determine if cause exists and how ultimately to dispose of the case."); *In re Winebrenner*, 170 B.R. 878, 881 (Bankr.E.D.Va.1994).

More pertinent to this particular case is the notion that a bankruptcy court may in fact have a duty to reopen a case in which new assets have been discovered in order to ensure that the assets are administered for the benefit of the debtor's creditors. *In re Mullendore*, 741 F.2d 306, 308 (10th Cir.1984).

> Many courts have held that a bankruptcy court does not abuse its discretion when it reopens a closed case to administer newly-discovered assets. In fact, some courts have stated that "it is the duty of the court to reopen an estate whenever prima facie proof is made that it has not been fully administered."

*Stackhouse v. Plumlee (In re Plumlee)*, 236 B.R. 606, 610 (E.D.Va.1999) (citations omitted).

The Court finds from the evidence presented during the hearing that the Debtor had a claim against the Objecting Parties when he filed his bankruptcy in 1995 and that he was aware of the existence of the claim at that time. The Debt-

ors now ask that the Court reopen their case and allow them to amend their schedules to add this claim as an asset.[5] The Debtors are also prepared to amend their Chapter 13 Plan to provide that the previously discharged debts will be paid out of any recovery. "Therefore, it appears the relief the [Debtors] seek is within the provisions of § 350(b)." *Daniel*, 205 B.R. at 348.

In considering the question of whether to reopen a closed bankruptcy case, courts have generally considered the following three interests: 1) the benefit to the debtor; 2) the prejudice or detriment to the defendant in the pending litigation; and 3) the benefit to the debtor's creditors. *In re Koch*, 229 B.R. at 85–86; *In re Maloy*, 195 B.R. 517, 518 (Bankr.M.D.Ga. 1996). The most immediate benefit of allowing the Debtors to reopen their case and amend their schedules would be that of protecting the Debtor's claims from being summarily dismissed, thus allowing the claims to be adjudicated on their merits. Therefore, the Debtor would be one step closer to the realization of his damages, which are currently estimated by the Debtors to be in the range of $6 million. As for the detriment to the Objecting Parties, if the Court allows the Debtors to reopen their case and amend their schedules, the Objecting Parties are likely to lose their judicial estoppel defense. However, even if that defense fails, all is not lost, as the Objecting Parties could still prevail on the merits. In light of this, the Debtors appear to have more to gain from reopening the case than the Objecting Parties have to lose. Additionally, as a policy

---

5. Section 521 of the Bankruptcy Code requires a debtor to file a schedule of assets and liabilities, as well as a statement of financial affairs. 11 U.S.C. § 521. The Debtor is required to include on Schedule B all "contingent and unliquidated claims." *See* FED.

R.BANKR P. 9009; OFFICIAL BANKR.FORMS 6, ¶ 20. The parties do not dispute the fact that the Debtors failed to list the claim in their original schedules or to amend those schedules at a later time.

matter, the Court is of the opinion that, whenever possible, the law should favor the resolution of issues on their merits. While the benefit to the debtor most likely outweighs the detriment to the Objecting Parties, at the very least, the first two factors neutralize one another, as "any benefit to Debtor would have to come as a detriment to [the Objecting Parties]." *Maloy,* 195 B.R. at 518.

It should also be noted that the case law interpreting and applying the doctrine of judicial estoppel, as it applies to bankruptcy cases, is by no means clear or uniform. Assuming that the parties' arbitration proceeds under Georgia state law, the Court agrees with the Objecting Parties that the Debtors' request to reopen their case is driven solely by their desire to defeat the Objecting Parties' judicial estoppel defense. Georgia courts have recognized that such an amendment effectively nullifies the original position taken in the bankruptcy case, and therefore, the failure initially to list the asset cannot serve as the basis upon which the second court applies the doctrine of judicial estoppel. *See Wolfork v. Tackett,* 241 Ga.App. 633, 526 S.E.2d 436, 438 (1999), *aff'd,* 273 Ga. 328, 540 S.E.2d 611 (2001); *see also Jowers v. Arthur,* 245 Ga.App. 68, 537 S.E.2d 200, 202 (2000) ("We have since reiterated that amending the bankruptcy petition to include the claim, even after the bankruptcy case was closed, precludes judicial estoppel from barring the claim."); *Johnson v. Trust Company Bank,* 223 Ga.App. 650, 478 S.E.2d 629 (1996).

However, at least one federal district court has found that the debtor's request to amend his schedules came too late to rectify the earlier inconsistency. *See Scoggins v. Arrow Trucking Company,* 92 F.Supp.2d 1372, 1376 (S.D.Ga.2000) ("Whatever [the Georgia state courts] intended, this Court concludes that federal judicial estoppel should require more. [The debtor] should not be permitted to duck his bankruptcy court disclosure obligation, then 'fess up' without consequence once exposed by his adversary."). Therefore, depending upon the manner in which the arbitrator applies the doctrine of judicial estoppel, a decision by this Court to reopen the case might not necessarily defeat the Objecting Parties' judicial estoppel defense, in which case the detriment to the Objecting Parties would be minimal.

The final factor to be considered, the potential benefit to the creditors, would appear to be the most important factor in this analysis. Assuming the Debtor recovers on his claims, the creditors, who are owed approximately $105,000 worth of debt, would receive payment. In *In re Daniel,* 205 B.R. 346 (Bankr.N.D.Ga.1997), while the court did not explicitly consider the three factors, it essentially weighed the potential benefit to the creditors against the detriment to the defendant in the litigation. The court noted that "[a] denial in the instant case of Debtor's motion to reopen would deprive Debtor's creditors of an opportunity to share in the fruits of any recovery Debtor may obtain." *Id.* at 348. This Court agrees with Judge Murphy's statement in *In re Daniel,* that "[r]eopening may be detrimental to [the defendant] by depriving it of a judicial estoppel argument[,] but this court cannot countenance depriving Debtor's creditors of the opportunity to share in damages to which Debtor is entitled in order to preserve [the defendant's] judicial estoppel argument." *Id.* at 349.

The Objecting Parties have urged the Court to consider the Debtors' conduct and bad faith, contending that the evidence presented clearly suggests that the Debtors intentionally failed to disclose the Debtor's claims against them in order to keep the asset and its potential recovery

all to themselves. Many courts have considered the debtor's lack of good faith when deciding whether to grant a debtor's request to reopen a case or to amend schedules. *Doan v. Hudgins (Matter of Doan)*, 672 F.2d 831 (11th Cir.1982) (when considering the debtor's request to amend schedules to exempt an asset, the court agreed that "concealment of an asset will bar exemption of that asset").

Most of these cases, however, addressed the question of whether a debtor should be allowed to reopen a bankruptcy case in order to add a creditor or a debt, seeking to ensure that the previously omitted debt would be discharged. In this context, a creditor is usually protesting the reopening, and the courts have developed the general rule that a debtor seeking to reopen his case to include a previously omitted creditor must bear the burden of establishing that the failure to list the creditor was not intentional or fraudulent. *See Samuel v. Baitcher (In re Baitcher)*, 781 F.2d 1529 (11th Cir. 1986); *In re Berry*, 190 B.R. 486 (Bankr. S.D.Ga.1995). Similarly, many circuits have adopted the rule that a debtor "may be prevented from amending her schedule only if her failure to include the creditor on the original schedule can be shown to have prejudiced him in some way or to have been part of a scheme of fraud or intentional design." *In re Rosinski*, 759 F.2d 539, 540 (6th Cir.1985).

This good faith/bad faith analysis is not as applicable in the instant case. Unlike a request to add a creditor or to exempt an asset, the debtor's request to *add* an asset, the liquidation of which could provide for payment to the creditors, could benefit, rather than harm, the creditors. The Court agrees that "[t]his distinction ... only adds greater impetus for applying the rule of reopening," as reopening should be allowed "where there is no harm to any

creditor and there is a possibility of recovery to the ... creditors." *See Bittel v. Yamato Int'l Corp.*, 1995 WL 699672, *2 (6th Cir.1995).

Nevertheless, the Court acknowledges that courts have considered the debtor's good faith, or lack thereof, when deciding whether to allow a debtor to reopen a case for the purpose of adding a cause of action that would otherwise be subject to a judicial estoppel defense. For example, in *In re Maloy*, the debtor's cause of action arose after he filed a petition under Chapter 7, 195 B.R. 517. Following the debtor's discharge and the closing of the case, the debtor filed a lawsuit. Six months later, in response to the defendant's judicial estoppel argument, the debtor filed a motion to reopen his case and amend his schedules to add the lawsuit as an asset and to claim the asset as exempt. Beginning its analysis by considering the above-mentioned factors, the *Maloy* court stated that "[a]s to the first and second aspects, it appears ... that any benefit to Debtor would have to come as a detriment to [the defendant]," and concluded that "[t]he question is whether the detriment of reopening the case as to [the defendant] would be fairly incurred." *Id.* at 518. The court then determined that, if the debtor is to enjoy some benefit, for which the defendant is to suffer a detriment, "there has to be a showing of good faith on the part of Debtor." *Id.* at 520. Concluding that the debtor had not established that his failure to list the cause of action was an honest mistake, the court completed its analysis by addressing the final factor, the benefit to the creditors. *Id.* at 521. The Chapter 7 Trustee's lack of interest in pursuing the suit persuaded the court that the possibility of a recovery for the creditors was remote, and this possibility seemed even more distant given the debtor's intention to claim the recovery as exempt. *Id.; see also In re Koch*, 229 B.R. 78 (Bankr.

E.D.N.Y.1999) (finding that the debtor's conversion of the reopened case to Chapter 11 evidenced bad faith and "prevented the creditors from participating in the recovery").

This Court is of the view that both the *Maloy* and *Koch* cases are distinguishable from the instant case, in that in those cases there was no possibility of the creditors receiving a benefit that would have justified reopening the case, notwithstanding the debtor's bad faith. The instant case does not present that scenario. As to the conduct of the Debtors in this case, the Court is persuaded that, initially, the Debtors did not intentionally fail to schedule the Debtor's claim as an asset. The Court finds credible the Debtor's testimony that he discussed the claim with his attorney, who told him that he did not have to disclose the claim. It is reasonable to assume that, at that time, Mr. Shapiro told the Debtor that the claim was "inchoate" or, as the Debtor put it, "some kind of asset that I really couldn't get," and therefore would be of no interest to the Trustee, the Court, or the Debtor's creditors until such time as he began to pursue it.

As for the failure to later amend the schedules, while the Debtors may not have been aware of a specific duty to amend their schedules, they were certainly cognizant of the benefits of nondisclosure. The fact that the Debtor questioned the Trustee about the possibility of paying off his plan early suggests that the Debtors were hoping to discharge the bulk of their debts before they were either successful in selling the code number or in collecting on the Debtor's claims. On the other hand, it is not difficult to imagine that the Debtor, after discussing the issue with the Trustee, could have truly believed that he had sufficiently informed the Court that he might eventually recover some additional property, but that, until he was either able to sell his code number or collect on his cause of action, these "assets" were useless to his creditors. In short, the Court believes that, while their motives were not always the purest, the Debtors were not the masterminds of a pervasive, sophisticated, and continuous plot to defraud their creditors or the Court.

The Court recognizes that full and honest disclosure is an absolute necessity if the bankruptcy system is to operate properly and does not, in any way, condone "playing fast and loose" with the disclosure rules. However, after weighing the three factors discussed above and considering the impact of the Debtors' lack of good faith, the Court is convinced that its proper role in such a case is first and foremost to protect the interests of the bankruptcy participants, primarily those of the creditors. In this case, the Court finds that the potential benefit to the creditors outweighs the detriment to the Objecting Parties and the lack of good faith on the part of the Debtors.

CONCLUSION

After giving this matter its careful consideration, the Court hereby **ORDERS** that:

A. The Debtors' Motion to Reopen and Amend shall be **GRANTED** on the condition that the Debtors comply with the remainder of this Order. The case will be **REOPENED** for the limited purpose of allowing the Debtors to amend their schedules and plan to include the claim against the Objecting Parties as an asset and to provide for the payment of their creditors upon receipt of any recovery. The Debtors must also file a Motion for Approval of Employment of Special Counsel to represent them in the arbitration. Said amendment and application must be filed by October 31, 2001.

B. The Debtors and their attorney shall submit a status report to the Chapter 13 Trustee regarding the pending arbitration every three months, the first of which shall be due on January 31, 2002. The Chapter 13 Trustee shall use the reports to periodically monitor the status of the arbitration.

C. In the event the Debtors reduce the Debtor's claim to judgment, the entire amount of the proceeds shall be the property of the Debtors' bankruptcy estate and shall immediately be remitted to the Chapter 13 Trustee. The Chapter 13 Trustee shall: 1) distribute that portion of the proceeds necessary to pay all claims of the Debtors' creditors that remained outstanding at the time the Debtors received their discharge; 2) pay the allowable claims for attorney's fees and expenses resulting from the arbitration; 3) withhold the Chapter 13 Trustee Administrative Fees; 4) remit the remainder of the proceeds to the Debtors; 5) file a final report; and 6) notify the Clerk's Office to close the case.

D. In the event that the Debtors fail to reduce the claim to judgment, the Debtors shall notify the Chapter 13 Trustee of such fact within 30 days of the date upon which the arbitration is completed and becomes unappealable. The Chapter 13 Trustee shall then notify the Clerk's Office to close the case.

**IT IS SO ORDERED.**

### *ORDER*

Currently before the Court is a Motion for Reconsideration, or In the Alternative, to Amend, filed by Primerica Financial Services, Inc., Primerica Life Insurance Company, Massachusetts Indemnity and Life Insurance Company, PFS Investments, Inc., PFSL Investments Canada, Ltd., Citigroup, Inc., and Arthur L. Williams, Jr. (collectively the "Objecting Parties"). The Objecting Parties seek a review of an Order entered October 1, 2001, wherein the Court granted, over the objection of the Objecting Parties, the Motion to Reopen Case filed by Harold and Marsha Tarrer (hereinafter the "Debtors"). This matter gives rise to a core proceeding within the Court's jurisdiction, *see* 28 U.S.C. § 157(b)(2)(A) & (O), and it shall be disposed of in accordance with the following reasoning.

### Discussion

Rule 59(e) of the Federal Rules of Civil Procedure grants bankruptcy courts license to reconsider orders and judgments after their entry. *See* Fed. R.Civ.P. 59(e) (made applicable to bankruptcy proceedings by Rule 9023 of the Federal Rules of Bankruptcy Procedure); *see also* Fed.R.Bankr.P. 9002 (references, like that of Rule 59(e) of the Federal Rules of Civil Procedure, to the alteration or amendment of a "judgment" shall be read to include reconsideration of any order appealable to an appellate court); *see also NationsBank of D.C., N.A. v. Blier (In re Creative Goldsmiths of Washington, DC)*, 178 B.R. 87, 90–91 (Bankr.D.Md.1995) (applying Rule 59(e) in bankruptcy proceeding). However, the goal of this provision is limited to the correction of any manifest errors of law or misapprehension of fact. *See Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir.1993); *Lux v. Spotswood Constr. Loans*, 176 B.R. 416, 420 (E.D.Va.), *aff'd*, 43 F.3d 1467, 1994 WL 621820 (4th Cir.1994). As one court has opined:

> [This Rule is] not designed to furnish a vehicle by which a disappointed party may reargue matters already argued and disposed of, nor [is it] aimed at providing a mechanism by which new arguments or legal theories, which could and should have been raised prior to the issuance of judgment, can be later advanced.

*In re DEF Inv., Inc.,* 186 B.R. 671, 680–81 (Bankr.D.Minn.1995) (citing *Bannister v. Armontrout,* 4 F.3d 1434, 1440 (8th Cir. 1993), *cert denied,* 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985)); *see also Concordia College Corp. v. W.R. Grace,* 999 F.2d 326, 330 (8th Cir.1993), *cert. denied,* 510 U.S. 1093, 114 S.Ct. 926, 127 L.Ed.2d 218 (1994); *Fed. Deposit Ins. Corp. v. World Univ., Inc.,* 978 F.2d 10, 16 (1st Cir.1992); *Dale & Selby Superette & Deli v. Dep't of Agric.,* 838 F.Supp. 1346, 1348 (D.Minn.1993); *DeGidio v. Pung,* 125 F.R.D. 503, 505 (D.Minn.1989). Attempts to take a "second bite at the apple," to introduce new legal theories, or to pad the record for an appeal, constitute an abuse of the Rule 59(e) motion, which the Court will not condone. Thus, the Court will grant a motion for reconsideration only under extraordinary circumstances, such as a change in the law or the facts upon which it based its decision. *See Dale & Selby Superette & Deli,* 838 F.Supp. at 1347–48.

▆▆▆▆ In the case at bar, the Objecting Parties seek reconsideration of the Court's Order, essentially on the ground that the Court has failed to follow the applicable case law. For example, the Objecting Parties cite *In re Baitcher,* 781 F.2d 1529 (11th Cir.1986), for the proposition that a case may only be reopened if the mistake or omission sought to be corrected resulted from an honest mistake, as opposed to the fraud or intentional design of the debtor. The Objecting Parties argue that by reopening the Debtor's case, despite the fact that the Court found that "the potential benefit to the creditors outweighs the detriment to the Objecting Parties and the lack of good faith on the part of the Debtors," the Court has failed to follow established precedent.

The Court declines to reconsider its ruling on this ground. The Court reviewed the cases cited by the Objecting Parties, including *In re Baitcher,*[1] and distinguished them from the Debtor's case in the October 1st Order. The Court continues to be of the opinion that it applied the correct analysis in arriving at its determination that the interests of the Debtors' creditors in potentially receiving full payment of over $100,000 worth of debt, which would otherwise remain discharged, justified reopening the Debtors' case. It appears to the Court that the Objecting Parties filed the instant motion for reconsideration, in part, to rehash the issue of whether, in the exercise of its broad discretion, the Court properly granted the Debtors' motion to reopen their case. The Court's decisions are "not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 287 (N.D.Ill. 1988).

▆▆▆▆ Alternatively, the Objecting Parties seek an amendment of the October 1st Order on the grounds that the Court failed to consider their request for alternative relief. In their initial objection to the Debtor's motion, the Objecting Parties stated that "[i]n the alternative, should the Court grant the Motion and permit the Debtors to reopen this case, the Court

---

1. The Court stated that the "good faith/bad faith analysis is not as applicable in the instant case .... [because] unlike a request to add a creditor or to exempt an asset, the debtor's request to *add* an asset, the liquidation of which could provide for payment to the creditors, could benefit, rather than harm, the creditors." The Court then concluded that "[t]his distinction ... only adds greater impetus for applying the rule of reopening," as reopening should be allowed " 'where there is no harm to any creditor and there is a possibility of recovery to the ... creditors.' " (quoting *Bittel v. Yamato Int'l Corp.,* 70 F.3d 1271, 1995 WL 699672, *2 (6th Cir.1995)).

should fashion an appropriate equitable relief to ensure that if there are any proceeds of Mr. Tarrer's claim in the arbitration ..., that they be devoted solely to the repayment of the creditors." In response, the Court ordered that the Debtors' case would be reopened on the condition that the Debtors agree to submit any proceeds recovered from the arbitration claim to the Chapter 13 Trustee for administration. The Court intended that such an administration of the proceeds would insure that the Debtors' creditors recover the full amount of their claims and that the expenses incurred in pursuing the asset and administering the Debtors' reopened case would be paid. To the extent that the Objecting Parties were requesting that the Court somehow prevent the disbursement of any remaining proceeds to the Debtors, the Court considered this request and determined that it lacked the legal authority to do so.

In the instant motion, the Objecting Parties elaborated upon their initial request by stating that the Order should be amended to require that any net recovery by the Debtors in excess of their obligations to creditors be paid to charities selected by the Court. In support of this remedy, the Objecting Parties cite to three cases, decided by federal district courts, in which the court awarded proceeds of litigation to charities.

In the first case, *In re Motorsports Merchandise Antitrust Litigation*, 160 F.Supp.2d 1392 (N.D.Ga.2001), the court authorized the distribution to charity of unclaimed proceeds of a class action anti-trust litigation, rather than return the funds to the defendant or allow the identified class members to divide the unclaimed

amounts between them. The second case, *Jones v. National Distillers*, 56 F.Supp.2d 355, 358 (S.D.N.Y.1999) also concerned the distribution of funds following the resolution of a class action securities litigation. The court determined that it would be appropriate to distribute to a local legal aid society approximately $18,000 of proceeds that remained unclaimed after notice had been sent to all claimants because: 1) the amount distributed to charity was only the residue of the settlement proceeds; 2) there was nothing further that could be done, on an economical basis, to locate the missing claimants; and 3) courts have approved charitable donations of unclaimed settlement funds to support non-profit provision of pro bono legal services. *Id.* Similarly, in the third case, *Superior Beverage Co. v. Owens–Illinois*, 827 F.Supp. 477, 478–79 (N.D.Ill.1993), the court authorized the distribution to a charity of the unclaimed proceeds from the settlement of a class action anti-trust litigation.

All of these cases involved the question of whether it is appropriate to distribute to charity unclaimed funds belonging to individuals who either could not be located or merely chose not to accept the funds. In this case, the Debtor has clearly been identified as the party who is entitled to the remaining proceeds, if any, that result from the resolution of his claim against the Objecting Parties. Therefore, these cases provide no authority for the proposition that the Court has the legal authority to order the Debtor to surrender his property rights, other than in repayment of the allowed claims of his creditors. The Court is aware of no statutory authority or case law that would support the equitable limitation suggested by the Objecting Parties.[2]

---

2. The only conceivable authority under which the Court could order the Debtor to donate his property to charity would be § 105 of the Bankruptcy Code, which provides that the

"court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). However, the Court declines to uti-

Accordingly, the Court must deny the Objecting Parties' request to amend the October 1st Order.

### CONCLUSION

The Court having given the matter its careful attention, it is **ORDERED** that the Objecting Parties' Motion for Reconsideration, or In the Alternative, To Amend, is hereby **DENIED.**

**IT IS SO ORDERED.**

lize this provision for this purpose. Section 105 does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986). Additionally, the Court finds that ordering the Debtor to turn over any net proceeds from the resolution of the arbitration proceeding would most likely be contrary to the general goal of the Bankruptcy Code of providing a recovery to creditors. Such an order would probably discourage the Debtor from pursuing the liquidation of this asset. As the Chapter 13 Trustee does not generally pursue such claims on behalf of a debtor's estate, the likely result of such an order would be that the claim against the Objecting Parties would be abandoned and the creditors would receive no payment.